Joseph M. Alioto (SBN 42680)
Theresa D. Moore (SBN 99978)
Jamie L. Miller (SBN 271452)
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, CA 94104
Telephone: (415) 434-8900
Facsimile: (415) 434-9200
Email: jmalioto@aliotolaw.com
       jmiller@aliotolaw.com

[ADDITIONAL COUNSEL LISTED ON LAST PAGE]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| Carolyn Fjord, Katherine R. Arcell, Keith Dean Bradt, Judy Bray, Jose' M. Brito, Jan Marie Brown, Robert D. Conway, Judy Crandall, Rosemary D'Augusta, Brenda K. Davis, Pamela Faust, Don Freeland, Donald V. Fry, Gabriel Garavanian, Harry Garavanian, Yvonne Jocelyn Gardner, Lee M. Gentry, Valarie Ann Jolly, Gail S. Kosach, Michael C. Malaney, Len Marazzo, Lisa McCarthy, Patricia Ann Meeuwsen, L. West Oehmig, Jr., Cynthia Prosterman, Deborah M. Pulfer, Dana L. Robinson, Robert A. Rosenthal, Bill Rubinsohn, Sondra K. Russell, Sylvia N. Sparks, June Stansbury, Clyde D. Stensrud, Wayne Taleff, Gary Talewsky, Annette M. Tippetts, Diana Lynn Ultican, J. Michael Walker, Pamela S. Ward. | CASE NO.: CV 13 3041 |
| | **COMPLAINT FOR INJUNCTIVE RELIEF AGAINST VIOLATIONS OF SECTION 7 OF THE CLAYTON ANTITRUST ACT** |

Plaintiffs,

v.

US AIRWAYS GROUP, INC. and US AIRWAYS, INC.,

Defendants.

- 1 -

Plaintiffs are and will be direct purchasers of airline tickets from defendants. The plaintiffs bring this action under Section 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 18, 26, to enjoin and prohibit the merger of defendant US Airways with AMR Corporation and American Airlines, Inc. Plaintiffs complain and allege as follows:

## INTRODUCTION

1. On February 14, 2013, the defendants announced that they had unanimously approved a definitive merger agreement, agreeing to combine in an all stock transaction, valued at more than $11 billion, merging American Airlines ("American") and US Airways ("USAir"), eliminating the substantial competition between them, and merging to create the world's largest airline. It is proposed that the unlawful combine would operate under the American name.

2. The effect of the announced merger between American and USAir may be to substantially lessen competition, or tend to create a monopoly, in the transportation of airline passengers in the United States and certain submarkets and in violation of Section 7 of the Clayton Antitrust Act, 15 U.S.C. § 18.

3. The probable and planned anticompetitive effects of this unlawful combination are increases in prices and fares, elimination and/or curtailment of services, elimination or curtailment of frequency of flights, curtailment of capacity of aircraft and available seats for passage, elimination of tens of thousands of jobs, the deterioration of quality of service, the addition of charges for amenities otherwise considered part and parcel of the service, the elimination or substantial cutback of traffic to hubs, the creation of monopolies for passenger air traffic from and to major cities, and the encouragement and trend to further concentrate the industry toward ultimate monopoly.

4. These anticompetitive effects have already been realized by reason of the other mergers which have occurred in the airline industry since 2008 and they have intensified in the past 12 months. For example, in the last year, there have been more than 10 nationwide price increases successfully imposed by the major legacy airlines, Delta, United, American and USAir, and since the recent mergers, impositions and increases in baggage charges, smaller seats, smaller planes and less capacity.

5.     Plaintiffs are individuals who are passengers and travel agents who have purchased airline tickets from defendants in the past and who are expected to do so in the future. They are threatened with losses or damage by reason of the defendants' merger with American in violation of Section 7 of the Clayton Act in the form of significant and substantial threats of higher prices for fares, diminished service and loss of flights, curtailment of capacity of aircraft and available seats, deterioration of quality of service, and lessening of competition, for which Plaintiffs cannot be adequately compensated by damages and, accordingly, they bring this action for preliminary and permanent injunctive relief against the merger pursuant to Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

## JURISDICTION

6.     This action is brought under Section 16 of the Clayton Antitrust Act, 15 U.S.C. §26, to prohibit the consummation and the effectuation of defendants' planned unlawful merger with American in violation of Section 7 of the Clayton Antitrust Act, 15 U.S.C. §18. This Court has subject matter jurisdiction of the federal antitrust claims asserted in this action under Section 16 of the Clayton Antitrust Act, 15 U.S.C. §26, and Title 28 United States Code Sections 1331 and 1337.

## THE PLAINTIFFS

7.     Each plaintiff named herein below is an individual and a citizen of the state listed as the address for each such plaintiff, and in the four years next prior to the filing of this action, each plaintiff purchased airline tickets from the defendants and/or American, and each plaintiff expects to continue to purchase airline tickets from the defendants or their merged entity in the future:

Carolyn Fjord, 4405 Putah Creek Road, Winters, CA 95694;

Katherine R. Arcell, 4427 S. Miro St., New Orleans, LA 70125;

Keith Dean Bradt, 690 W 2nd St, Suite 200, Reno, NV 89503;

Judy Bray, 5140 N Union Blvd., Ste 200, Colorado Springs, CO 80918;

Jose' M. Brito, 2715 Sage Bluff Ct., Reno, NV 89523;

*Complaint for Injunctive Relief Against Violations of Section 7 of the Clayton Antitrust Act*

1    Jan Marie Brown, 975 Kennedy Dr., Carson City, NV, 89706;

2    Robert D. Conway, 6160 W Brooks Ave., Las Vegas, NV 89108;

3    Judy Crandall, 4085 Ramrod Circle, Reno, NV 89519

4    Rosemary D'Augusta, 347 Madrone St., Millbrae, CA 94030;

5    Brenda K. Davis, 11022 Old Military Trail, Forney, TX, 75126;

6    Pamela Faust, 6227 Whileaway Dr., Loveland, Ohio 45140;

7    Don Freeland, 73801 White Sands Dr., Thousand Palms, CA 92276;

8    Donald V. Fry, 6740 Northrim Ln., Colorado Springs, CO 80919;

9    Gabriel Garavanian, 104 Sequoia Road, Tyngsboro, MA 01879;

10   Harry Garavanian, 104 Sequoia Road, Tyngsboro, MA 01879;

11   Yvonne Jocelyn Gardner, 10-Gold Coin Ct., Colorado Springs, CO 80919;

12   Lee M. Gentry, 7021 Forestview Dr., West Chester, OH 45069-3616;

13   Valarie Ann Jolly, 2121 Dogwood Loop, Mabank, TX 75156;

14   Gail S. Kosach, 4085 Ramrod Cir., Reno, NV 89519;

15   Michael C. Malaney, 5395 Egypt Creek NE., Ada, MI 49301;

16   Len Marazzo, 1260 Springer Ct., Reno, NV 89511;

17   Lisa McCarthy, 35 Lancashire Place, Naples, FL 34104;

18   Patricia Ann Meeuwsen, 1062 Wedgewood, Plainwell, MI 49080;

19   L. West Oehmig, Jr., 1017 East Brow Road, Lookout Mountain, TN 37350;

20   Cynthia Prosterman, 527 20th Avenue, San Francisco, CA 94121;

21   Deborah M. Pulfer, 16264 E. Mason Rd., Sidney, OH 45365;

22   Dana L. Robinson, 127B Palm Bay Terrace, Palm Beach Gardens, FL 33418;

23   Robert A. Rosenthal, 4659 Bridle Pass Drive, Colorado Springs, CO 80923;

24   Bill Rubinsohn, 261 Old York Road, Jenkintown, PA 19046;

25   Sondra K. Russell, 1206 N. Loop 340, Waco, TX 76705;

26   Sylvia N. Sparks, 3320 Conte Drive, Carson City, NV 89701;

27   June Stansbury, 363 Smithridge Park, Reno, NV 89502;

28   Clyde D. Stensrud, 1529 10th St W., Kirkland, WA 98033;

1    Wayne Taleff, 768 Farmsworth Ct., Cincinnati, OH 45255;

2    Gary Talewsky, 14 Cow Hill Rd., Sharon, MA 02067;

3    Annette M. Tippetts, 2783 East Canyon Crest Dr., Spanish Fork, Utah 84660;

4    Diana Lynn Ultican, 9039 NE Juanita Dr, #102, Kirkland, WA 98034;

5    J. Michael Walker, 11865 Heather Ln., Grass Valley, CA 95949;

6    Pamela S. Ward, 1322 Creekwood Dr., Garland, TX 75044.

7                                    **THE DEFENDANTS**

8        8.      US Airways Group, Inc. ("USAir") is a corporation incorporated under the

9    laws of the State of Delaware with its principal place of business in Tempe, Arizona.

10       9.      US Airways Inc. is a Delaware corporation that has its principal place of

11   business in Tempe, Arizona.

12       10.     USAir operates the fifth largest domestic carrier, with more than 45 billion

13   domestic revenue passenger miles ("RPMs") from 2011-2012. One RPM equals one

14   passenger flown one mile. RPMs are the commonly accepted measure of airline size in the

15   industry.

16       11.     USAir operates the US Airways Shuttle, a US Airways brand which provides

17   hourly service between Boston, New York, and Washington, D.C. Regional airline service is

18   branded US Airways Express, operated by contract and subsidiary airline

19       12.     USAir has and operates hubs in Charlotte, Philadelphia, Phoenix, and

20   Washington, D.C. Ronald Reagan International Airport.

21       13.     With its regional partners, USAir carries approximately 62 million passengers

22   per year.

23       14.     USAir also provides scheduled transportation of cargo throughout the United

24   States and around the world.

25       15.     USAir has more than 31,000 full-time employees.

26       16.     USAir regularly conducts business by operating commercial flights into and

27   out of this judicial district.

28

## AMERICAN AIRLINES

17.    AMR Corporation ("AMR") is a corporation incorporated under the laws of the State of Delaware with its principal place of business in Fort Worth, Texas. AMR is, as of the date of the filing of this complaint, in Chapter 11 proceedings in the United States Bankruptcy Court for the Southern District of New York, Case No. 11-15463 (SHL).

18.    AMR is a holding company that owns and operates American Airlines, Inc.

19.    American Airlines, Inc. ("American") is a Delaware corporation that has its principal place of business in Fort Worth, Texas. AMR owns 100 percent of the common stock of American Airlines, Inc. and AMR Eagle Holding Corporation ("American Eagle"), and those two companies are wholly owned and controlled subsidiaries of AMR. American Airlines, Inc. is in the business of air transportation of passengers for hire throughout the United States and between cities in the United States and numerous international destinations. American and American Eagle are, as of the date of filing this complaint, in Chapter 11 proceedings in the United States Bankruptcy Court for the Southern District of New York, Case No. 11-15463 (SHL).

20.    American operates the fourth largest domestic carrier, with more than 73 billion RPMs from 2011-2012.

21.    With its regional partners, American carries approximately 136 million passengers per year.

22.    American is engaged in the business of transporting passengers and cargo and has approximately 76,200 full-time employees.

23.    American operates domestic hubs at Dallas/Forth Worth, Chicago O'Hare, Miami, Los Angeles, and New York JFK.

24.    American's subsidiary shares its name with American Eagle, and operates much of the regional carrier's flights; since November 2012, the subsidiaries of SkyWest, Inc., SkyWest Airlines and ExpressJet Airlines, have also operated regional flights as American Eagle. In addition, AmericanConnection is the regional brand for codeshare flights currently operated by Chautauqua Airlines.

25. AMR is reported to imminently merge with defendant USAir and will be the surviving entity as a result of the proposed merger. The American-USAir merger will be the fourth merger of major U.S. airline companies since 2008, when Delta merged with Northwest Airlines. In 2010, United Airlines merged with Continental Airlines, and in 2011, Southwest merged with AirTran.

## NATURE OF TRADE AND COMMERCE

26 The relevant product and geographic markets for purposes of this action are the transportation of airline passengers in the United States.

27. Within the relevant market, well-defined submarkets may exist which, in themselves constitute product markets for antitrust purposes.

28. American and USAir are substantial rivals and competitors in the relevant market.

29. American and USAir are substantial potential rivals and potential competitors in the relevant market.

30. Not only do American and USAir provide competing passenger service against each other on a number of passenger routes, but also they are potentially able to provide competing passenger service against each other on any route anywhere in the United States if they believe it would be profitable to do so.

31. American CEO Horton has admitted that, "Airlines are networks, even where no overlap, they are competing against each other because of these connecting flights."

32. Former Continental CEO, and now United CEO, Jeff Smisek admitted that existing airlines can easily enter new markets: "I mean, there are---competitors can enter your market at 540 miles an hour, so it's very easy to enter a market when you are already an airline...If I decide I want to fly to Charlotte tomorrow, all I have to do—I would want to sell the seats of aircraft, but I could take a 737 and point it to Charlotte and there I'd be. So it's actually fairly easy to enter markets."

33. American has the capability to serve every major market in the United States with a population above 5,000 people.

34. USAir has the capability to serve every major market in the United States with a population above 5,000 people.

35. The behavior of American is constrained by the actual and potential competition from USAir throughout the entire relevant market and submarkets.

36. The behavior of USAir is constrained by the actual and potential competition from American throughout the entire relevant market and submarkets.

37. USAir has publicly admitted in judicial proceedings that the national market for air transportation is the only relevant air transportation market for antitrust purposes. *In re Air Passenger Computerized Reservations Systems*, 694 F.Supp. 1443, 1467 (C.D. Cal. 1988).

38. American has publicly acknowledged that the national market for air transportation is the only relevant market for antitrust purposes.

39. In *Continental Airlines v. American Airlines* (S.D. Tex. 1993) Civ Nos. G-92-259, G-92-266 1993 WL 379396 *2, American's position on relevant market was as follows: "Defendants [American] claim that the national United States market is the only geographic relevant market to this case. Defendants [American] claim that the national United States air passenger service market includes all air passenger service within the United States. Defendants [American] also claim that, for purposes of analyzing their national pricing actions, hubs and regions are not relevant markets separate from the national market that contains them."

40. The market for the transportation of airline passengers in the United States is in and part of interstate commerce, makes extensive use of the instrumentalities of interstate commerce, and substantially affects interstate commerce. Airline passengers travel in a continuous and uninterrupted flow of interstate commerce. Airline travel is a continuous and uninterrupted flow of interstate commerce. Materials used in the construction of airplanes are purchased and shipped in a continuous and uninterrupted flow of interstate commerce.

41. Any restraint of trade in the transportation of airline passengers in the United States, including the restraints specifically alleged in this complaint, directly and substantially restrains and affects interstate commerce.

**TREND TOWARDS CONCENTRATION**

42.     In enacting and amending § 7 of the Clayton Act, "Congress sought to preserve competition among many small businesses by arresting a trend towards concentration in its incipiency before that trend developed to the point that a market was left in the grip of a few big companies." *United States v. Von's Grocery Co.*, 384 U.S. 270, 277 (1966) [emphasis added]. The line of Supreme Court cases relying upon this principle of law has never been overruled and remains controlling law.

43.     The Supreme Court has held that, "'The dominant theme pervading congressional consideration of the 1950 amendments was a fear of what was considered to be a rising tide of economic concentration in the American economy.' To arrest this 'rising tide' towards concentration into too few hands and to halt the gradual demise of the small businessman, Congress decided to clamp down with vigor on mergers...Thus, where concentration is gaining momentum in a market, we must be alert to carry out Congress' intent to protect competition against ever increasing concentration through mergers." *United States v. Von's, supra*, 384 U.S. at 276-277.

44.     The Supreme Court has held that, "What we have … is simply the case of two already powerful companies merging in a way which makes them even more powerful than they were before. If ever such a merger would not violate § 7, certainly it does when it takes place in a market characterized by a long and continuous trend toward fewer and fewer owner-competitors which is exactly the sort of trend which Congress, with power to do so, declared must be arrested." *United States v. Von's, supra,* 384 U.S. at 278.

45.     The Supreme Court has held that, "We cannot avoid the mandate of Congress that tendencies toward concentration in industry are to be curbed in their incipiency, particularly when those tendencies are being accelerated through giant steps striding across a hundred cities at a time." *Brown Shoe, Co. v. United States*, 370 U.S. 294 (1962).

46.     The Supreme Court has held that where market "concentration is already great, the importance of preventing even slight increases in concentration and so preserving the

1  possibility of eventual deconcentration is correspondingly great." *United States v.*
2  *Philadelphia Nat'l Bank,* 372 U.S. 321, 362 n.42 (1963).

3      47.    The proposed merger of defendants with American will result in the largest
4  airline company in the United States.

5      48.    The projected combined market shares of the merged USAir-American entity
6  (24%), and those of the next three largest competitors, Delta (22%), United (19%), and
7  Southwest (18%), will be approximately 83%, a figure well in excess of the 77% of the
8  combined market share of the four top firms that was condemned by the Supreme Court in
9  *United States v. Philadelphia Nat'l Bank, supra,* 374 U.S. 321, where the defendants proposed
10  to merge the 2nd and the 3rd largest banks in a four-county area. That merger, like the
11  proposed USAir-American merger would have resulted in intense concentration of the market.
12  The Supreme Court enjoined the merger, holding that the resultant market share of the
13  combined firm, as well as the significant intense concentration in the market, were both so
14  high as to be presumptively illegal.

15      49.    The merger of USAir and American will result in the largest airline in the
16  United States with 24% of the U.S. air passenger market and a highly concentrated market
17  share by the top four airlines of approximately 83%. Such concentrations of market share in
18  four firms are unacceptably high according to the Supreme Court in *United States v. Alcoa,*
19  377 U.S. 271 (1964), which required divestiture where nine firms controlled 95% of all
20  aluminum created in the United States. In the narrower submarket for insulated aluminum
21  conductor, Alcoa was third with only 11.6% of the market and Rome Cable Corporation was
22  eighth with 4.7%; however, five companies controlled 65% and four smaller companies added
23  another 23%. Based on these figures the Supreme Court deemed both of markets "highly
24  concentrated."

25      50.    Similarly, the market share that will result from defendants' merger with
26  American will exceed that which was condemned in *United States v. Continental Can Co.,*
27  378 U.S. 441 (1964), where the second largest competitor, Continental Can, acquired the sixth

28

largest competitor, Hazel-Atlas, with Continental Can's post-merger market share rising from 21.9% to 25%. There, the Supreme Court ordered divestiture.

51. The number of major airlines remaining after the defendants' proposed merger with American will be four, reflecting a persistent pattern of concentration and reduction of competition in the U.S. airline industry over the past several years. The Supreme Court in *United States v. Vons, supra,* 384 U.S. 270, considered such factors alone to violate § 7 of the Clayton Act (the acquisition by Von's, which had a 4.7% share of the market, of Shopping Bag, with 4.2% of the market, together with the growing number of grocery market chains and the shrinking number of independently-owned stores resulted in the Court holding "these facts alone are enough to cause us to conclude...that the Von's-Shopping Bag merger did violate § 7").

52. The proposed merger of defendants and American is a merger of far larger competitors, resulting in a far greater share of the market in the merged entity than the Supreme Court prohibited in *United States v. Pabst Brewing Co.,* 384 U.S. 546 (1966), where the Court ordered divestiture of a merged entity which had combined the 10th and 18th largest brewers in the United States, but which, when combined, resulted in just the 5th largest brewer with only 4.49% of all domestic beer sales.

53. These Supreme Court cases have not been overruled or even diminished by later opinions and they determine beyond peradventure that the proposed USAir-American merger is unlawful.

54. In *Hospital Corp. of America v. Federal Trade Commission,* 807 F.2d 1381, 1385 (7th Cir. 1986), Judge Posner of the Seventh Circuit observed the above line of Supreme Court precedent, taken together, prohibited "any nontrivial acquisition of a competitor."

## CONDUCT GIVING RISE TO VIOLATIONS OF LAW

55. On February 14, 2013, American and USAir announced an agreement in which the two carriers will combine to form a new company with a value of $11 billion.

56. The new airline will operate under the name American Airlines Group, Inc.

57. The proposed merger will create the country's largest airline.

1    58.    The proposed merger will create the world's largest airline.

2    59.    The chief executive officer of the combined company will be Doug Parker, the

3    current chairman and CEO of USAir.

4    60.    Tom Horton, CEO of American, will serve as non-executive chairman of the

5    combined company's Board of Directors until after the combined company's first shareholder

6    meeting in approximately mid-2014.

7    61.    Mr. Parker will become executive chairman of the Board when Mr. Horton

8    ceases to be non-executive chairman.

9    62.    Prior to announcing the merger Mr. Parker said, "I find it noteworthy that the

10   only opposition that seems to exist to this merger is the senior management at American. I

11   don't want to guess why it is that they don't support it. But we are hopeful that we can get

12   their support at some point in the future."

13   63.    When the merger is completed, Mr. Horton will receive nearly $20 million -

14   about half, or $9.9 million, in cash and half in shares of the new company.

15   64.    Mr. Parker and Mr. Horton met on July 19, 2012, to discuss a potential merger

16   between American and USAir.

17   65.    Through secret and private meetings, Mr. Parker of USAir met on more than

18   one occasion with Mr. Horton of American.

19   66.    One or more of the secret and private meetings of Mr. Parker and Mr. Horton

20   was carried on outside of their offices, including in hotel rooms.

21   67.    At one or more of the secret and private meetings, Messrs. Parker and Horton

22   discussed the purposes and probable effects of the merger.

23   68.    At one or more of the secret and private meetings, Messrs. Parker and Horton

24   discussed airline fares in general and specifically.

25   69.    At one or more of the secret and private meetings, Messrs. Parker and Horton

26   discussed the frequency of flights.

27   70.    At one or more of the secret and private meetings, Messrs. Parker and Horton

28   discussed the elimination or curtailment of the use of hubs.

71. At one or more of the secret and private meetings, Messrs. Parker and Horton discussed the curtailment of capacity.

72. At one or more of the secret and private meetings, Messrs. Parker and Horton discussed the firing of employees.

73. At one or more of the secret and private meetings, Messrs. Parker and Horton discussed the type of aircraft to be eliminated.

74. At one or more of the secret and private meetings, Messrs. Parker and Horton discussed the charges for services previously given to passengers for free.

75. At one or more of the secret and private meetings, Messrs. Parker and Horton discussed the possible combination of American and USAir.

76. At one or more of the secret and private meetings, Messrs. Parker and Horton discussed the potential fare increases in the monopoly submarkets that would be created by the combine.

77. At one or more of the secret and private meetings, Messrs. Parker and Horton discussed the potential fare increases in the duopoly submarkets created by the combine.

78. In an extraordinary admission contained in a letter written to American's employees by Mr. Horton on July 10, 2012, American's chairman and CEO admitted that he went to competing airlines to seek their permission and approval to enter a combination between American and their companies:

> In fact, last year, I approached my counterparts at other airlines about the merits of possible combinations. Since that time, as we embarked on the restructuring journey, I have held the view that it is best that first put our house in order before considering a complex and challenging airline acquisition.

79. The combined company and its regional partners will provide access to more than 337 destinations in 56 countries, have approximately $38 billion in annual aggregate revenues, operate a mainline fleet of nearly 1,000 aircraft, and employ approximately 113,000 people worldwide.

80.    Combined, American and USAir will have more than 119 billion RPMs domestically. Their combined RPMs comprise 21% of domestic capacity, which tops the current domestic leaders, United Air Lines and Delta Airlines.

81.    If the merger is consummated, the United States will be left with just four major airlines, which will dominate the United States market. The three major legacy airlines will be the new combined American, United, and Delta. The fourth is low-cost carrier ("LCC") and legacy look-alike, Southwest Airlines.

82.    If the merger is consummated, as much as 83% of the United States domestic airline industry will be controlled by just four airlines.

83.    If the merger is consummated, it will result in lower capacity; that is, fewer seats in the sky, which, in turn, will result in higher ticket fares for consumers.

84.    If the merger closes, Defendants and American will reduce their overall capacity.

85.    Defendants' and American's merger would occur in and further concentrate an already highly concentrated market, characterized by mergers, including the most recent mergers of Southwest and AirTran in 2011, United and Continental in 2010 (which made United the U.S.'s largest carrier), and Delta and Northwest Airlines in 2008.

86.    In addition, Defendants and American are themselves the products of mergers and acquisitions.

87.    In 2001, American Airlines merged with Trans World Airlines. TWA was one of the largest domestic airlines in the United States and following the merger, American shut it down, together with TWA's St. Louis hub, despite American's representations it would not do so.

88.    For its part, America West acquired and merged with US Airways in 2005. The new company adopted the name US Airways Group.

89.    Since these mega-mergers started in 2007-2008, capacity has been substantially reduced despite a strengthening economy and increased demand for aircraft.

90. Delta cut 41% of its flight out of Memphis when it merged with Northwest. Before the merger, Northwest had 300 flights out of Memphis. After the merger, only 90 flights remained.

91. Since 2007, in the 29 largest hubs, scheduled domestic capacity has been reduced by 9%.

92. Since 2007, in the 35 medium hubs, scheduled domestic capacity has been reduced by 26%.

93. Since 2007, in the 70 small hubs, scheduled domestic capacity has been reduced by 18%.

94. Remaining flights have become more crowded.

95. If the proposed merger is permitted, the merged entity will reduce service to smaller and mid-sized communities. USAir CEO Parker has admitted that the less lucrative, smaller community routes are the first to go: "If it is a choice to ask us to divest slots and give them to another carrier, we by definition, with a scarce resource, will continue to (serve markets) that are most lucrative, will reduce service to small and mid-sized communities and the carriers that get those slots will fly to large communities."

96. Capacity reduction has resulted in higher prices for fares and other services. If the proposed merger is consummated, the top three airlines will control over 80% of the domestic airline market, and the top four airlines, including Southwest, will control 96% of the market.

97. The proposed merger would be the fourth mega-merger in five years in the airline industry. The prior mergers have resulted in fare increases and capacity decreases. Another merger will drive up fares.

98. Although it was formally expected that low-cost airlines, especially Southwest, would constrain legacy airfare increases, that is no longer the case, especially since Southwest merged with AirTran, the major low-cost carrier competitor of Southwest. So, AirTran no longer constrains Southwest from increasing prices, nor does Southwest constrain the legacy

1    airlines from increasing their prices. Consequently, many and significant price increases have
2    taken place since 2008.

3        99.    During the late summer/early fall of 2012, Southwest launched two of the three
4    fare increases that stuck during the quarter. When an attempted increase by United faltered,
5    Southwest revived it. An expert says this was "the first time [he] remembers a low-cost airline
6    reviving a failed domestic price increase in almost a decade of watching fares."

7        100.   Southwest raised fares in markets following the mergers of Delta, Northwest,
8    US Airways, and America West, more than average fare increases overall, unless another low-
9    cost airline was already in that market. The merger of Southwest with its principal low-cost
10   rival lessens the potential that Southwest could counteract higher fares in markets following
11   this proposed merger.

12       101.   If the proposed merger closes, US Air's Philadelphia operations, one of
13   USAir's main operation centers, will be transferred to Dallas (American's operations hub),
14   and the merged entity will cut jobs.

15       102.   If Defendants and American are permitted to merge, air fares will increase.

16       103.   Air fares have already increased nationwide as a result of the mega-mergers
17   beginning in 2007-2008.

18       104.   In 2012 alone there were seven successful price increases instituted by the
19   major airlines.

20       105.   Shortly after the announcement of the USAir-American merger, prices were
21   increased by $4 to $10 roundtrip on domestic flights throughout the United States by Delta,
22   United, American, and US Airways. Southwest matched the increase on a limited scale.

23       106.   Since the mega mergers began, the major airlines have increased their ancillary
24   fees. In 2012, Delta, United, American, and USAir made more than $1 billion in reservation
25   change fees. In 2012, US domestic airlines collected more than $3.5 billion in baggage fees.
26   The four major carriers Delta, United, American and USAir in 2013, all raised their prices on
27   ticket changes from $150 to $200. If the proposed merger is consummated, these fees will
28   increase.

107.    The American-USAir merger would surpass United's in terms of number of employees, seat capacity, and operating revenues to create the largest passenger airline in the United States and the world.

108.    The Department of Justice approved the mergers of Northwest and Delta in 2008, the merger of United and Continental in 2010, and the merger of Southwest and AirTran in 2011.  During Congressional hearings on the Delta-Northwest merger, then House Judiciary Committee Chairman John Conyers stated, "We have an antitrust division that approves mergers left and right."  He further observed that "The department has not attempted to block or modify any major merger over the last seven years, including some of the largest, most controversial mergers among direct competitors."  Given these facts, this action is the only remaining avenue available to "arrest" the march to monopoly power in the airline industry.

109.    The new American will operate nine hubs, including hubs in five of the six largest cities in the United States.

110.    Because American and USAir have several connecting hubs in the same region, the combined American will cut flights to some of those hubs.

111.    The merged airline will cut flights to the Phoenix, Arizona hub.

112.    The merged airline will cut flights to the Charlotte, North Carolina hub.

113.    The merged airline will cut flights to the Philadelphia, Pennsylvania hub.

114.    Since American and USAir do not share any airport hubs, there is a substantial and probable likelihood that USAir's hubs in Philadelphia and Charlotte will be shutdown or substantially cut back in favor of American's better hubs in New York and Miami.

115.    In addition, 59 out of the 116 domestic airports served by USAir from Charlotte are also served by Miami.

116.    In talking about New York and Miami, American CEO Horton has said, "These are the most important population centers and we are very strong in them.  What the airline (USAir) does is carry a lot of connecting traffic over Charlotte and does so in a way that I would suggest is somewhat unrewarding."

117. Closing hubs is not unprecedented. Following the American acquisition of TWA, St. Louis ceased to be an American hub, even though they had promised not to close it. Following the Delta-Northwest merger, service at Delta's hub in Cincinnati and Northwest's hub in Memphis was greatly reduced.

118. Defendants' and American's merger will increase market concentration in some of the largest U.S. cities, namely, Los Angeles, Philadelphia, Chicago, Washington, D.C., Dallas, and Phoenix.

119. In addition, at the airport level, the following domestic airports will experience undue increases in market concentration as a result of the defendants' and American's merger: Charlotte Douglas International Airport (combined American will control over 92.1% of daily departures), Dallas-Fort Worth International Airport (combined American will control over 86% of daily departures), Philadelphia International Airport (combined American will control over 78% of daily departures), Miami International Airport (combined American will control over 70% of daily departures), Ronald Reagan Washington National Airport (combined American will control over 62% of daily departures), Phoenix Sky Harbor International Airport (combined American will control over 50% of daily departures), LaGuardia Airport (combined American will control over 31% of daily departures), O'Hare International Airport (combined American will control over 38% of daily departures), and Los Angeles International Airport (combined American will control over 21% of daily departures).

120. The new combined company's dominance at the airports listed in paragraph 119 will result in higher fares for flights to and from those airports.

121. Non-stop service is typically preferred by some passengers.

122. Defendants and American have overlapping non-stop flights on 12 routes, including, *inter alia*, Charlotte to Dallas-Fort Worth, Charlotte to Miami, Charlotte to Chicago, Charlotte to New York LaGuardia, Dallas-Fort Worth to Phoenix, Dallas-Fort Worth to Philadelphia, and Dallas-Fort Worth to Chicago. Defendants' combination will result in higher fare prices on these routes.

123. American and USAir overlap on 12 non-stop airport pair routes. In four markets involving hub-to-hub routes, the transaction would result in a monopoly. In seven additional airport pair markets, post-merger concentration is in excess of 9,000 Herfindahl-Hirschman Index ("HHI"), with large changes in HHI, many of which are larger than 4,000 points.

124. The seven overlapping routes which will result in a monopoly are Charlotte-Dallas-Fort Worth; Charlotte-Miami; Dallas-Fort Worth-Philadelphia; Miami-Philadelphia; Dallas-Fort-Worth-Phoenix; Washington D.C.-Raleigh; Nashville-Washington, D.C.

125. If the USAir and American merger is permitted, the number of competitors in airport-pair markets will go from two competitors to just one in 24 airport-pair markets. The merger will reduce the number of competitors from three to two in 475 markets. The merger will reduce the number of competitors from four to three in 749 airport-pair markets.

126. If the proposed merger is permitted, there would be 530 more airport-pairs losing an effective competitor than the merger between United and Continental in 2010.

127. If the combination of American and USAir is allowed in at least twenty-two routes, changes in market concentration and post-merger concentration will exceed the thresholds specified in the Horizontal Merger Guidelines by the Department of Justice and are presumed, therefore, to lead to adverse competitive effects, including increases in fares, reductions in service, and loss of choice.

128. Following airline deregulation in 1978, many mergers and acquisitions occurred: Delta Air Lines merged with Western Airlines; United Airlines acquired Pan American Airlines' Pacific routes; Northwest acquired Republic Airlines; American Airlines and Air California merged; American acquired TWA; America West acquired US Airways; Delta acquired Northwest; and United acquired Continental.

129. In addition, since deregulation, the legacy carriers bought or controlled the new and growing feeder airlines with the specific purpose and intent of preventing them from becoming major competitors.

130.    In addition, defendants compete now on hundreds of domestic connecting routes, where competition will be reduced or eliminated as a result of defendants' merger with American.

131.    The new airline will operate in a much more highly concentrated market.  As a result, the prospects for effective collusion among the airlines remaining after defendants' and American's merger will substantially increase.

132.    The potential for increased collusion among the remaining airlines is significant, because the domestic passenger airlines, including, *inter alia*, the defendants and American, have in the past colluded to fix prices with regard to airfares, surcharges, and cargo prices, and to fix other terms and conditions of air transportation and travel.

133.    In addition to the degree to which market concentration has increased, there are substantial and significant barriers to entry into the industry in the relevant market, as well as a history of a lack of successful new entry.  There have been only two new major carriers in recent years: Southwest Airlines and Jet Blue, both of which took substantial time to develop. On the contrary, the relevant market has been characterized by the exit, rather than the entry, of firms.  In addition, Defendants' and American's combination will create an airline with nine hubs, making entry into markets between such hubs particularly difficult for a non-hub carrier because the prospective entrant will not have access to feed traffic and because the combined American, as hub carrier, will have significant marketing advantages.  The prospect of new entry is, therefore, unlikely to eliminate any of the anticompetitive effects that will eventuate from the defendants' and American's merger and the increasingly concentrated structure of the relevant market.

134.    There have been no new viable competitors since 2000.

135.    USAir CEO Parker has publicly admitted that, "You cannot cover your cost of capital by starting up a new airline."

136.    Both of the CEO's of American and U.S. Airways have indicated publicly their approval of the elimination of capacity and their desire to further concentrate the industry and eliminate capacity further, with the obvious result of higher fares.

137.    American and USAir have agreed that any cost savings by reason of the merger's elimination of duplicative functions will not be passed on to the consumer in forms of lower prices. To the contrary, every indication is that a merger of American and USAir will result in higher fares charged to passengers, notwithstanding any so-called cost savings.

138.    The defendants' and American's proposed merger will cause harm to consumers, including the plaintiffs, by generating higher airfares, reducing the number of flights on particular routes, and by eliminating air service to smaller communities. Consumers, including the plaintiffs, will thus pay more for less airline service than would be the case in the absence of the merger.

139.    Former Chairman of the House Committee on Transportation and Infrastructure, Representative James Oberstar (D-Minn.), has stated that, "The real victim in this process is the traveling public…The reduction of choices, the increasing power of the fortress hub makes it unlikely that other carriers would enter those markets where both American and USAir serve, because they'll be competing with a much bigger presence, with more power to serve those markets."

140.    There are 29 major airports in the United States, located in the following cities: Atlanta, Baltimore, Boston, Charlotte, Chicago, Dallas, Denver, Detroit, Fort Lauderdale, Houston, Las Vegas, Los Angeles, Miami, Minneapolis, New York, Newark, Orlando, Philadelphia, Phoenix, Portland, Salt Lake City, San Diego, San Francisco, Seattle, Tampa, and Washington D.C.

141.    Each major U.S. passenger airline, including American and USAir, have the ability and financial capacity to offer competitive flights between any two major cities in the United States, whether or not they currently offer such flights.

142.    Each major U.S. passenger airline, including American and USAir, have the ability and financial capacity to establish a competitive presence in any of the major airports located throughout the United States by, *inter alia*, leasing or otherwise utilizing terminal slots, hiring employees, and directing more flights to and from the given airport.

143.    The proposed merger will eliminate American's actual rival, USAir.

144.  The proposed merger will eliminate American's potential rival, USAir.

145.  Neither company is a failing company.

146.  American CEO Mr. Horton publicly stated on numerous occasions that American would emerge from bankruptcy independently and strong enough to compete with United and Delta.

147.  Horton has publicly stated that, "[American] is going to be very successful. I think we have a very powerful company coming out of restructuring. Our company is only going to get more volume."

148.  In a December 13, 2012, meeting with American Airlines' pilot union leaders, Mr. Horton outlined his plan for a stand-alone exit from bankruptcy.

149.  In January 2013, American revealed its new logo. It was the company's first external logo redo in more than 40 years.

150.  The largest aircraft order ever was by American, which purchased nearly 500 new aircraft for $40 billion to be delivered beginning in 2013.

151.  USAir's CEO Parker has stated that, "Either of our airlines could compete independently. No one is suggesting that we couldn't."

152.  American posted a $44 million profit in January 2013.

153.  USAir's President Scott Kirby has publicly stated that, "We have a business model that works, that is profitable, and generates margins that are far superior to American's...Our results prove that."

154.  USAir reported a 2012 net income of $637 million, up 797% from a $71 million net profit in 2011.

155.  House Representative John Conyers (D-MI), noted in a February 26, 2013 hearing before the House Judiciary Committee's Subcommittee on Regulatory Reform, Commercial and Antitrust Law discussing the American-USAir merger that, "While American is still in bankruptcy, it is poised to successfully reorganize in billions of dollars in cash and reduced costs as a result of reorganization. Moreover, USAir posted record profits. These

1    facts suggest that both airlines are in fact perfectly capable of surviving, even thriving as

2    standalone companies."

3        156.    Since the major airlines already offer flights to and from various major U.S.

4    cities, each such airline, including defendants USAir and American, necessarily has the

5    managerial expertise to offer similar flights between any two major cities in the United States.

6        157.    The major U.S. passenger airlines, including defendants US Air and American,

7    frequently trade, sell, lease, or purchase slots from other airlines in each of the major 29

8    airports throughout the United States.

9        158.    The major U.S. passenger airlines with significant market share in specific

10   regions or major airports, including defendants USAir and American, endeavor to keep other

11   major airlines from entering the market with competitive flights.

12       159.    On information and belief, each major U.S. passenger airline, including

13   defendants USAir and American, has created internal documents reflecting a financial and

14   economic cost/benefit analysis of increasing its presence in each or many of the major U.S.

15   airports.

16       160.    On information and belief, each major U.S. passenger airline, including

17   defendants USAir and American, has created internal documents reflecting its analysis of how

18   the market for air transportation would be impacted within each regional market or major U.S.

19   airport by the entry of another major U.S. passenger airline into that region or major airport.

20       161.    The entry of American or USAir into regions or major airports that are

21   dominated, controlled, or serviced by other major passenger airlines would result in lower

22   prices, increased service levels, and/or other pro-competitive effects on flights within the

23   region to or from the given major airport.

24       162.    As the foregoing paragraphs show, the effect of the defendants' and

25   American's merger, if consummated, may be substantially to lessen competition, or tend to

26   create a monopoly in the relevant markets.

27       163.    By reason of the defendants' and American's proposed merger, the plaintiffs

28   are threatened with loss or damage in the form of higher ticket prices and diminished service.

*Complaint for Injunctive Relief Against Violations of Section 7 of the Clayton Antitrust Act*

1    If the merger is consummated, the plaintiffs will sustain irreparable harm for which damages

2    will be unable to compensate plaintiffs, in that competition will be lessened. Service once lost

3    cannot easily be restored. Accordingly, plaintiffs bring this action for both preliminary and

4    permanent injunctive relief against defendants' and American's merger.

### VIOLATION ALLEGED

### Clayton Act, Section 7

7    164.    The conduct of defendants described hereinabove, specifically their agreement

8    to merge with American, constitutes a violation of Section 7 of the Clayton Antitrust Act, 15

9    U.S.C. § 18, in that the effect of the proposed merger may be substantially to lessen

10   competition, or to tend to create a monopoly in the transportation of airline passengers in the

11   United States; by reason of which violation the plaintiffs are threatened with loss or damage in

12   the form of higher ticket prices and diminished service, as well as irreparable harm for which

13   damages will be inadequate to compensate plaintiffs, such that plaintiffs are entitled to bring

14   suit under Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26, to obtain preliminary and

15   permanent injunctive relief against defendants' merger, and to recover their cost of suit,

16   including a reasonable attorney's fee.

### PRAYER FOR RELIEF

18   WHEREFORE, plaintiffs demand the following relief from this Honorable Court:

19   A.    Declaring, finding, adjudging, and decreeing that the agreement of the

20   defendants and American to merge violates Section 7 of the Clayton Antitrust Act, 15 U.S.C.

21   § 18.

22   B.    Preliminarily enjoining the defendants from consummating their merger during

23   the pendency of this action.

24   C.    Permanently enjoining the defendants from consummating their merger or

25   requiring divestiture.

26   D.    Awarding to plaintiffs their cost of suit, including a reasonable attorney's fee,

27   as provided by Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

28

E. Granting to plaintiffs such other and further relief to which they may be entitled and which the Court finds to be just and appropriate.

Dated: July 2, 2013

**ALIOTO LAW FIRM**

By:_____

Joseph M. Alioto (SBN 42680)
Theresa D. Moore (SBN 99978)
Jamie L. Miller (SBN 271452)
**ALIOTO LAW FIRM**
One Sansome Street, 35th Floor
San Francisco, CA 94104
Telephone: (415) 434-8900
Facsimile: (415) 434-9200
E-mail: jmalioto@aliotolaw.com
    jmiller@aliotolaw.com

*Complaint for Injunctive Relief Against Violations of Section 7 of the Clayton Antitrust Act*

## PLAINTIFFS' COUNSEL

1

2  Joseph M. Alioto (SBN 42680)
   Theresa D. Moore (SBN 99978)
3  Jamie L. Miller (SBN 271452)
   ALIOTO LAW FIRM
4  One Sansome Street, 35th Floor
   San Francisco, CA 94104
5  Telephone: (415) 434-8900
   Facsimile: (415) 434-9200
6  Email: jmalioto@aliotolaw.com
          jmiller@aliotolaw.com
7

8  Gil D. Messina
   *Pro Hac Vice Pending*
9  Timothy A. C. May
   *Pro Hac Vice Pending*
10 Messina Law Firm, P.C.
   961 Holmdel Road
11 Holmdel, NJ 07733
   Telephone: (732) 332-9300
12 Facsimile: (732) 332-9301
13 Email: gmessina@messinalawfirm.com
          tmay@messinalawfirm.com
14

15 John Haslet Boone
   LAW OFFICES OF JOHN H. BOONE
16 4319 Sequoia Drive
   Oakley, CA 94561
17 Telephone: (415) 434-8900
   Facsimile: (415) 434-9200
18 Email: deacon38@gmail.com

19

20

21

22

23

24

25

26

27

28

*Complaint for Injunctive Relief Against Violations of Section 7 of the Clayton Antitrust Act*